UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
PHOENIX DIVISION

| | |
|---|---|
| UNITED STATES COMMODITY FUTURES TRADING COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> THOMAS L. HAMPTON, <br><br> Defendant. | ) <br> ) <br> ) Civil Action No. 13-cv-01173-HRH <br> ) <br> ) <br> ) <br> ) <br> ) ORDER FOR ENTRY OF FINAL <br> ) JUDGMENT BY DEFAULT AND <br> ) ORDER FOR PERMANENT <br> ) INJUNCTION AND OTHER <br> ) ANCILLARY RELIEF AGAINST <br> ) THOMAS L. HAMPTON <br> ) <br> ) <br> ) <br> ) <br> ) |

This matter is before the Court on Plaintiff's, U.S. Commodity Futures Trading Commission (the "Commission" or "CFTC"), Motion for Entry of Final Judgment by Default and Order for Permanent Injunction and Other Ancillary Relief against Defendant Thomas L. Hampton ("Motion for Default Judgment"). For the reasons stated below and good cause having been shown, the Commission's Motion for Default Judgment is GRANTED.

### I.   PROCEDURAL HISTORY

On June 11, 2013, the Commission filed a Complaint for Permanent Injunction, Civil Monetary Penalty, and Other Equitable Relief ("Complaint") against Hampton alleging

1

violations of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1, *et seq.* (2006 & Supp. V 2011), as amended by the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, Title XIII (the CFTC Reauthorization Act of 2008 ("CRA")), §§ 13101-13204, 122 Stat. 1651 (enacted June 18, 2008), and the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"), Pub. L. No. 111-203, §§ 701-774, 124 Stat. 1376, 1641, *et seq.* (effective July 16, 2011), and certain Commission Regulations ("Regulations") promulgated thereunder, 17 C.F.R. §§ 1.1 et seq. (2011).

The Complaint alleges, in relevant part, that from approximately September 2010 through at least September 2011, Hampton acted as an unregistered commodity pool operator ("CPO") and solicited or caused to be solicited $5.2 million from at least 72 members of the general public to invest in a commodity pool for the purpose of trading commodity futures contracts.  The Complaint further alleges that Hampton defrauded pool participants by distributing to them false account statements that misrepresented the true value of the pool and the pool participants' accounts, all in violation of 7 U.S. C. §§6b(a)(1)(B), 6*o*(1)(A) and (B), and 6m(1).

On August 3, 2013, Hampton was personally served with a copy of the summons and Complaint.  Hampton is not a minor, incompetent, or exempt under the Soldiers' and Sailors' Civil Relief Act.  To date, Hampton has not filed an answer to the Complaint or otherwise defended this action.  *See Docket generally.*  On August 30, 2013, the Clerk of Court entered a default against Hampton for failure to respond to the Complaint or otherwise defend the action pursuant to Rule 55(a) of the Federal Rules of Civil Procedure.

The Court has carefully considered the Complaint, the factual allegations of which are well-pleaded and hereby taken as true, the memorandum of points and authorities the Commission filed

in support of its Motion for Default Judgment, and supporting declarations and exhibits, and, being fully advised and familiar with the record in this matter, hereby enters findings of fact and conclusions of law, and issues a final order of permanent injunction that also provides for a civil monetary penalty and ancillary relief pursuant to Section 6c of the Act, 7 U.S.C. §13a-1 (2012), as set forth herein.

THE COURT FINDS:

## II.     FINDINGS OF FACT

### A.  Jurisdiction and Venue

This Court possesses jurisdiction over this action pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2012), which authorizes the Commission to seek injunctive and other relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2012), because Hampton resides and transacts business in this district.

### B.  Defendant

Defendant **Thomas L. Hampton** resides in Scottsdale, Arizona.  Hampton is the managing director and sole signatory for HCM.   During the relevant period, Hampton was the only authorized trader on HCM Pool commodity interest accounts held at Interactive Brokers, LLC ("IBL"), a registered futures commission merchant ("FCM").  Hampton has never been registered with the Commission in any capacity.

**C. Hampton's Trading Activities And Fraudulent Activities**

During the relevant period, Hampton controlled the operations of HCM. Hampton is the sole owner and sole employee of HCM. Hampton is the sole signatory on each of HCM's bank accounts held at Bank of America ("BOA"), including an account used to accept pool participant deposits ("HCM bank account"). In addition, Hampton was the only authorized trader on the HCM Pool's trading accounts, described immediately below.

In January 2010, Hampton opened an HCM Pool trading account at IBL in the name of "Private Client, LLC." The account opening documents for this account identify Hampton as the only authorized trader. Hampton traded E-mini S&P 500 futures and E-mini Dow futures contracts in this account as well as securities products.

In May 2011, Hampton opened another HCM Pool trading account at IBL in the name of "HCM." The account opening documents identify Hampton as the only authorized trader. Hampton traded E-mini S&P 500 futures in this account as well as securities products.

During the relevant period, Hampton controlled and operated a public website, www.hamptoncap.com (the "website"). Among other things, Hampton represented in the website that he was a former CBOT floor trader and index-arbitrage trader who had discovered a successful derivative arbitrage trading strategy that would generate 10% annualized returns (.83% per month).

During the relevant period, Hampton induced a pool participant residing in Texas, who was also employed as a financial advisor ("PP-1"), to solicit approximately 34 of his clients to deposit funds with the HCM Pool. During the relevant period, Hampton induced another pool participant residing in Arizona, who was also employed as a financial advisor ("PP-2"), to solicit approximately 36 of his clients to deposit funds with the HCM Pool.

Hampton caused PP-1 and PP-2 to represent to prospective pool participants that they (the prospective pool participants) could earn either 10% annualized returns on their deposits (.83% per month) or share in 50% of profits earned from returns of the HCM Pool.

During the relevant period, Hampton distributed to prospective pool participants a document entitled "Low-latency Index Derivative Arbitrage Offering Memorandum" which also represented that he was a former CBOT floor trader and index-arbitrage trader who had discovered a successful derivative arbitrage trading strategy that would generate 10% annualized returns (.83% per month).

During the relevant period, Hampton solicited or caused to be solicited approximately $5.2 million dollars from more than 72 members of the general public for the purpose of trading, among other things, E-mini S&P 500 and E-mini Dow futures contracts through the HCM Pool. These funds were deposited into an account held at BOA, the HCM Bank Account.

During the relevant period, Hampton transferred a total of approximately $4 million from HCM's BOA account to the two HCM Pool trading accounts at IBL described above.   Hampton used $3.8 million of the HCM Pool participants' funds to execute trades on behalf of the HCM Pool and sustained losses of approximately $3.75 million.

During the relevant period, Hampton transferred approximately $335,000 from the HCM bank account to his personal bank account and made $100,000 in counter withdrawals from the HCM bank account.

During the relevant period, Hampton falsely represented to HCM Pool participants that their share of the HCM Pool had increased in value, when in fact Hampton was incurring significant trading losses.  Such information is important to actual and prospective pool

participants given that it affects their decision-making process of whether and when to withdraw funds from the pool or possibly invest additional funds.

During the relevant period, Hampton failed to disclose to actual and/or prospective pool participants that he was incurring trading losses in the HCM Pool accounts. During the relevant period, Hampton defrauded existing and prospective HCM Pool participants by distributing to pool participants false account statements via e-mail, U.S. mail, or online.  These monthly account statements typically represented that the HCM Pool or fund was profitable and that the pool participant's account had earned either .83 % on the funds deposited or 50% of the HCM Pool's purported profits.  In fact, Hampton's actual trading in the HCM Pool accounts resulted in net losses virtually every month.

For example, from October 2010 through August 2011, one pool participant received account statements signed by Hampton which represented that the pool participant had earned $416.67 per month on his initial deposit of $50,000.  These statements were false since Hampton's trading in the HCM Pool accounts, during this same period, sustained consistent net losses and total losses of approximately $3.2 million.

During the relevant period, Hampton also issued monthly account statements to at least two pool participants which represented that the fund returned 4.17% and 16.245% in July 2011 and August 2011 respectively.  These account statements were false since the fund lost $339,239.06 in July 2011 and $1,263,352.33 in August 2011.

Hampton knew these account statements were false because he had lost most of the pool participants' funds used to trade in the HCM Pool trading accounts as described above. Hampton was required to disclose the HCM Pool's trading losses because he is a CPO and therefore a fiduciary to his pool participants.   Hampton was separately required to disclose such

material information because he falsely represented and/or caused to be represented to actual and prospective HCM Pool participants that his trading strategy was enormously successful in the past and the HCM Pool would be generating, and was generating, consistent profits. Hampton was required to disclose the truth about his actual trading performance every day that pool participants maintained a subscription with HCM.

Pool participants maintained and/or deposited additional funds with the HCM Pool as a result of these false account statements that represented false "profit" returns. At no time during the relevant period was Hampton registered with the Commission in any capacity or exempt from such requirement. In or about October 2011, pool participants learned that Hampton had lost all of their funds.

### III.   CONCLUSIONS OF LAW

**A.  Hampton Violated Section 4b(a)(1)(B) of the Act, 7 U.S.C. §§ 6b(a)(1)(B)**

Section 4b(a)(1)(B) of the Act, 7 U.S.C. §§ 6b(a)(1)(B) (2006), provides, in relevant part, that it is unlawful for any person, in or in connection with any order to make, or the making of, a futures contract, for or on behalf of any other person "willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record[.]"

From at least September 2010 through September 2011, Hampton violated Section 4b(a)(1)(B) of the Act, 7 U.S.C. §§ 6b(a)(1)(B) (2006), by, among other things, distributing false account statements to pool participants.

Each issuance of a false report, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(1)(B) of the Act, 7 U.S.C. §§ 6b(a)(1)(B) (2006).

**B.  Hampton Violated Section 4*o*(1) of the Act, 7 U.S.C. § 6*o*(1) (2006)**

Section 4*o*(1) of the Act, 7 U.S.C. § 6*o*(1) (2006), prohibits CPOs from using the mails or any other means or instrumentality of interstate commerce to (A) employ any device, scheme or artifice to defraud any client or participant or prospective client or participant, or (B) engage in any transaction, practice or course of business which operates as a fraud or deceit upon any client or participant or prospective participant.

From at least September 2010 through at least September 2011, Hampton acted as a CPO by soliciting, accepting, or receiving funds from others while engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, for the purpose of, among other things, trading in futures.

Hampton violated Section 4*o*(1)(A) and (B) of the Act, 7 U.S.C. § 6*o*(1)(A) and (B) (2006), in that he employed or is employing a device, scheme or artifice to defraud actual and prospective pool participants, or engaged or is engaging in transactions, practices, or a course of business which operated or operates as a fraud or deceit upon the pool participants or prospective pool participants.  The fraudulent acts include distributing false account statements to pool participants.

Each issuance of a false report, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4*o*(1) of the Act, 7 U.S.C. § 6*o*(1) (2006).

**C.  Hampton Violated Section 4m(1) of the Act, 7 U.S.C § 6m(1) (2006)**

Section 4m(1) of the Act, 7 U.S.C § 6m(1) (2006), provides that it is unlawful for any CPO, unless registered, to make use of the mails or any means or instrumentality of interstate commerce in connection with its business as a CPO.

8

During the relevant period, Hampton used the telephone, email, U.S. mail, and/or the Internet in or in connection with his business as a CPO, while failing to register as a CPO, in violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2006).  Each use of the mails or any means or instrumentality of interstate commerce by Hampton, while acting as a CPO, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2006).

**THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that Hampton has violated Sections 4b(a)(1)(B) , 4*o*(1), and 4m(1) of the Act, 7 U.S.C. §§ 6b(a)(1)(B), 6*o*(1), and 6m(1) (2006).  Therefore, judgment shall be and hereby is entered in favor of the Plaintiff, U.S. Commodity Futures Trading Commission, and against Hampton as follows:

## IV.   PERMANENT INJUNCTION

Pursuant to 7 U.S.C. § 13a-1, the Court may permanently enjoin acts or practices that violate the Act.  Accordingly:

**IT IS HEREBY ORDERED THAT:**

1. Based upon and in connection with the foregoing conduct, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), Hampton is permanently restrained, enjoined, and prohibited from directly and indirectly:

   a. willfully making or causing to be made to other persons any false report or statement or willfully entering or causing to be entered for other persons and false record in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a

9

        designated contract market, for or on behalf of any other person in violation of Section 4b(a)(1)(B) of the Act, 7 U.S.C. § 6b(a)(1)(B)(2012);

    b. while acting as a CPO, using the mails or any instrumentality of interstate commerce to employ any device, scheme, or artifice to defraud any client participant or prospective client or participant in violation of Section 4$o$(1) of the Act, 7 U.S.C. § 6$o$(1) (2012);

    c. while acting as an unregistered CPO, using the mails or any instrumentality of interstate commerce in connection with their business as a CPO in violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2012);

2. Hampton is permanently restrained, enjoined, and prohibited from directly or indirectly:

    a. trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the Act, as amended by the Dodd-Frank Act, to be codified at 7 U.S.C. § 1a);

    b. entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 1.3(hh), 17 C.F.R. § 1.3(hh) (2013)) ("commodity options"), security futures products, swaps (as that term is defined in Section 1a(47) of the Act, as amended, and as further defined by Commission regulation 1.3(xxx), 17 C.F.R. 1.3(xxx)) ("swaps"), and/or foreign currency (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act, 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i)(2012)) ("forex contracts") for their own

10

      personal account, proprietary account or for any account in which they have a direct or indirect interest;

c. having any commodity futures, options on commodity futures, commodity options, security futures products, swaps, and/or forex contracts traded on their behalf;

d. controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, security futures products, swaps, and/or forex contracts;

e. soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, security futures products, swaps, and/or forex contracts;

f. applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2013); and

g. acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2013)), agent, officer, or employee of any person (as that term is defined in Section 1a of the Act, as amended, to be codified at 7 U.S.C. § 1a) registered, exempted from registration, or required to be registered

with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2013).

## V.   CIVIL MONETARY PENALTY

**A.   Civil Monetary Penalty**

1. Hampton shall be liable for and pay to the Commission a civil monetary penalty in the amount of One Million Five Hundred Thousand Dollars ($1,500,000) ("CMP Obligation") within ten (10) days of the date of this Order. If Hampton does not pay his CMP Obligation in full within ten (10) days of the date of entry of this Order, then post-judgment interest shall accrue on his CMP obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961.

2. Hampton shall pay his CMP Obligation by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

> Commodity Futures Trading Commission
> Division of Enforcement
> Attn: Accounts Receivable – AMZ-340
> E-mail Box: 9-AMC-AMZ-AR-CFTC
> DOT/FAA/MMAC
> 6500 S. MacArthur Blvd.
> Oklahoma City, Oklahoma 73169
> Telephone: 405-954-5644

If payment is to be made by electronic funds transfer, Hampton shall contact Linda Zurhorst or her successor at the above address to receive payment instructions and shall fully comply with those instructions. Hampton shall accompany payment of the penalty with a cover letter that identifies Hampton and the name and docket number of this proceeding. Hampton shall

simultaneously transmit copies of the cover letter and the form of payment to the Director, Division of Enforcement, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, N.W., Washington, D.C. 20581, and the Chief, Office of Cooperative Enforcement, at the same address.

**B.     Provisions Related to Monetary Sanctions**

3.     Satisfaction:  Upon full satisfaction of Hampton's CMP Obligation, a satisfaction of judgment will be entered into as to Hampton.

4.     Partial Satisfaction:  Any acceptance by the Commission of partial payment of Hampton's CMP Obligation shall not be deemed a waiver of his obligation to make further payments pursuant to this Order, or a waiver of the Commission's right to seek to compel payment of any remaining balance.

## VI.     MISCELLANEOUS PROVISIONS

**IT IS FURTHER ORDERED THAT:**

5.     Notices:  All notices required to be given by any provision in this Order shall be sent certified mail, return receipt requested, as follows:

> Notice to the Commission:
>
> Attention - Director of Enforcement
> Commodity Futures Trading Commission
> Division of Enforcement
> 1155 21st Street N.W.
> Washington, DC 20581

All such notices to the Commission shall reference the name and docket number of this action.

6.     Invalidation:  If any provision of this Order or if the application of any provision or circumstance is held invalid, then the remainder of this Order and the application of the provision to any other person or circumstance shall not be affected by the holding.

7. Continuing Jurisdiction of this Court: This Court shall retain jurisdiction of this action to ensure compliance with this Order and for all other purposes related to this action, including any motion by Hampton to modify or for relief from the terms of this Order.

8. Copies of this Order may be served by any means, including facsimile transmission, e-mail, United Parcel Service, and Federal Express, upon Hampton, and any other entity or person that may be subject to any provision of this Order.

**IT IS FURTHER ORDERED** that, there being no just cause for delay, counsel for the Commission shall forthwith tender to the court the Commission's proposed judgment.

**DATED** at Anchorage, Alaska, this 23rd day of January, 2014.

/s/ H. Russel Holland
United States District Judge